# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Criminal No. 2:12-cr-00065-NT-1 |
| v. | ) |
| | ) |
| | ) |
| BRUNEL CONSTANT. | ) |

## SECOND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The Defendant, Brunel Constant, is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). He is scheduled for a jury trial before this Court on May 20-21, 2013. On May 13, 2013, the Court re-opened the hearing on the Defendant's Motion to Suppress Identification Evidence (ECF No. 29) to determine whether witness Adam Dennis's in-court identification of the Defendant should be suppressed. *See* Report of Conference (ECF No. 99). After considering the testimony and evidence presented at this hearing, and counsels' arguments, the Court will allow Dennis to make an in-court identification.

### Background

The Court describes here the factual and procedural background relevant to its decision. The facts surrounding the charged offense and witness Adam Dennis's involvement as an eyewitness are set forth in greater detail in the Court's factual findings in its Opinion and Order on Motions to Suppress (ECF No. 74).

1

1. **Defendant's Motion to Suppress**

In August of 2012, the Defendant filed two motions to suppress evidence, a Motion to Suppress Identification Evidence (ECF No. 29) and a Second Motion to Suppress Evidence (ECF No. 30). Defendant's first motion sought to suppress the testimony of four witnesses about their identification of the Defendant in a photo array, as well as any in-court identifications by these witnesses of the Defendant. The second motion sought to suppress the firearm the Defendant is charged with possessing, which was seized from a porch eave during a warrantless search. The Court held evidentiary hearings on the motions on November 26, 2012 and January 25, 2013.

In its Opinion and Order on Motions to Suppress, the Court determined that the six-photo array that was shown by Lewiston Police Department Officer Derrick St. Laurent to the four witnesses was impermissibly suggestive because, while all the photos in the array were of black men, the Defendant was the only man in the array with long dreadlocks wearing a white tank top, the two salient details in the description given to the police. *Id.* at 6; *see id.* at 3. But the Court ultimately concluded that the identifications of two out of the four witnesses, Alan Roy and Adam Dennis, were nonetheless reliable. *Id.* at 18-20. Dennis had been in a face-to-face altercation with the suspect for five to ten minutes and was shown the photo array the same day as that altercation. *Id.* at 19.[1] The Court credited Dennis's testimony that he had no difficulty identifying the Defendant in the photo array and

---

[1] Roy, a closer call, recognized the suspect from around Lewiston and had seen him several times that night, including once when the suspect passed right by him in a lit hallway. *Id.* at 19-20.

concluded that Officer St. Laurent had confused Dennis with Roy when he testified that Dennis had initially hesitated between two photos in the array before choosing the Defendant. *Id.* at 7, 7 n.3. The Court thus concluded that Dennis and Roy's identifications of the Defendant from the photo array were reliable enough to go to the jury. *Id.* at 21.

2. **Defendant's Motion In Limine**

On May 8, 2013, the Defendant filed a motion in limine asserting that on May 7, 2013, the Government produced a disk that contained a never-before-seen video recording of Officer St. Laurent's August 19, 2011 interview with Dennis and Dennis's identification of the Defendant in the photo array. First Motion in Limine (ECF No. 94). The Defendant included a copy of the video recording as an exhibit to the motion. First Motion In Limine Ex. A (ECF No. 94-1).

The Court held a conference of counsel on May 10, 2013. The Government explained that the disk had come from the Lewiston Police Department labeled "Dennis interview." The Government did not attempt to listen to the recording and assumed that it was Jencks material that the Government was obligated to produce only shortly before trial. *See* 18 U.S.C. § 3500(a). The Government denied knowing that the disk contained a video recording of the photo array. The disk included statements of Officer St. Laurent and Dennis, both of whom testified at the November 26, 2012 suppression hearing. As such, the Government was required under Federal Rules of Criminal Procedure 26.2 & 12(h) to produce the disk no later

3

than after Officer St. Laurent and Dennis testified.[2] The disk also contained material which was exculpatory to the Defendant and which would have been useful to impeach both Officer St. Laurent and Dennis.

As a result of the newly discovered evidence, the Court continued the trial date by one week and re-opened the hearing on the Defendant's Motion to Suppress Identification Evidence to determine whether the newly discovered evidence altered the Court's determination of the admissibility of Dennis's identification of the Defendant. *See* Report of Conference (ECF No. 99).

**3. The Re-Opened Hearing on Defendant's Motion to Suppress**

At the May 13, 2013 hearing, the government played the video of the photo array. At the beginning of the video, Officer St. Laurent tells Dennis: "so looks like we got the guy that did it." After a brief interview about the events of the previous evening, Officer St. Laurent asks Dennis if he thinks that he could pick the man that he saw out of a photo line-up, and Dennis responds, "Sure, I guess so." Officer St. Laurent tells Dennis that the suspect may not be in the photo array. Officer St. Laurent has two manila folders in his lap, and he pulls the photograph of the Defendant out of one of the folders. As Officer St. Laurent moves the Defendant's photo to the second folder, it is clearly visible to Dennis, who is looking directly at it. Officer St. Laurent puts the Defendant's photo into the second folder, and then he

---

[2] The Government acknowledged that it received the disk from Officer St. Laurent in a timely fashion and took full responsibility for the delayed disclosure. Government counsel apologized profusely for its failure to comply with its discovery obligations, and the Court finds that the Government's failure to produce the video recording was inadvertent. Because the suppression hearing was re-opened and the Defendant was given an additional week to prepare for trial, the Defendant has not been prejudiced by the untimely disclosure. The Court thus believes that the sanction of excluding Dennis's testimony in its entirety is not appropriate.

pulls the six photos out of the second folder and places them one-by-one on the table in front of Dennis. He puts the Defendant's photo front and center before Dennis.

"It's a tough one," Dennis immediately says, "I'm guessing it's him, that would be the one I'd be putting my money on," pointing his forefinger at the Defendant. "Either him, or him," he adds, now pointing his pinky at another photo of a lighter-skinned black man with short dreadlocks wearing an orange jumpsuit. "Either, you know, it wasn't any of these guys, I know that," Dennis says, pointing quickly at the remainder of the photos. "Yeah, I'm not sure," he mumbles. Without waiting a beat, Officer St. Laurent says, "So you think it's this one right here," tapping at the Defendant's photo. "Yeah," Dennis says. "Alright," says Officer St. Laurent, reaching for a pen, "you just want to sign that for me?" "Sign it?" "Yeah just sign it and put today's date on it." Dennis signs the photo of the Defendant. "So that's the guy we have in custody right now," Officer St. Laurent tells Dennis.

Officer — now Detective — St. Laurent and Adam Dennis testified at the hearing. Detective St. Laurent acknowledged that the recording of the Dennis photo array should be a "video on how not to do a photo lineup."

Dennis testified that he had an altercation with the man he identified at 4:00 a.m. the morning of August 19, 2011, that lasted five to ten minutes. He testified that the whole exchange with the man he roused from the porch was memorable because it grew heated, and the man promised to come back with a gun. He testified he was in a well-lit hallway for part of the time that he was speaking with the Defendant. Dennis testified that he had about two beers over the course of the night

5

he saw the man and that he was not impaired.[3] He remained confident that he could identify the person that he saw that night. He did not remember being rushed, hesitating between two photos, or feeling as though Officer St. Laurent was suggesting that he pick one photo in particular. Dennis did admit that he made some racial slurs during the altercation with the man on the porch after the man got belligerent.

## Discussion

**1. Relevant Law**

"[E]vidence is not normally suppressed because it is debatable or arguably unreliable—much testimony at trial is of this character—and customarily cross-examination is the means of testing the strength of such evidence." *United States v. Jones,* 689 F.3d 12, 17 (1st Cir. 2012). "Both as to pretrial identifications and in-court identifications, our analysis takes two steps. We look first to see if there was anything impermissibly suggestive about the identification procedure and, second, if there was impermissible suggestiveness, 'to decide whether the identification itself was reliable under the totality of the circumstances.'" *United States v. Holliday,* 457 F.3d 121, 125 (1st Cir. 2006). The totality of the circumstances includes:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior

---

[3] Alan Roy previously testified that he and Dennis purchased a twelve-pack and a forty ounce of beer after they completed work on August 18th. On cross-examination, Dennis conceded he might have had more than two beers, but he maintained that he was not impaired. Even if Dennis had consumed half of the beer purchased (a fact not in evidence), that amount of beer over the course of ten hours for a person the size of Dennis would not necessarily have impaired his ability to perceive the incident. In the video made approximately 12 hours later, Dennis appears fresh and shows no residual signs of impairment.

6

description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson v. Brathwaite,* 432 U.S. 98, 114 (1977). "The standard being applied is meant to screen out only evidence that is clearly unreliable and not to supplant the jury's ordinary function of weighing what the witness says and choosing the weight to accord it." *Jones,* 689 F.3d at 18. "[I]dentification evidence – identifications made before trial and in the courtroom – should be suppressed as a matter of due process 'only in extraordinary cases.'" *Holliday,* 457 F.3d at 125 (quoting *United States v. Henderson,* 320 F.3d 92, 100 (1st Cir. 2003)).

**2. The Reliability of Dennis's Identification**

The Court has already ruled that the photo array shown to Dennis was impermissibly suggestive. Viewing the video strengthens this conclusion exponentially. The reliability analysis is weighed against the "corrupting effect of the suggestive identification." *Manson,* 432 U.S. at 114. There can be no question here that the photo array could have had a corrupting effect. The question is whether the case falls within that narrow class of "extraordinary cases" which require judges to supplant the jury's role of weighing the identification for themselves. This is a very close call. Ultimately, however, the Court concludes that despite the extremely suggestive nature of the photo array, Dennis's identification is sufficiently reliable to go to the jury.

Dennis's testimony at the May 13, 2013 suppression hearing remained consistent with his prior testimony. He testified that he saw the man on the porch

for five to ten minutes and part of the encounter took place in a lit hallway. He testified that his interaction with the man was memorable because it grew heated and the man threatened to come back with a gun. Although Dennis had been drinking that evening, there is no evidence that Dennis was impaired. The fact that Dennis's original description of a black man with long braids lacked detail may have been the result of the rushed interview. Dennis made his identification approximately twelve hours after the incident when his memory was fresh.

As for the level of certainty demonstrated at the time of the confrontation, the video shows that Dennis hedges in his language — "I'm guessing," "I'm not sure" — but he clearly points to the Defendant first before he widens the field to the Defendant and one other. And because Detective St. Laurent rushed Dennis to sign the photograph of the Defendant, there is no way of knowing whether Dennis would have definitively ruled out the second photo had he been given time to consider.

The video recording of Dennis's identification of the Defendant is not inconsistent with Dennis's prior testimony about the array. During the November 26, 2012 hearing, Dennis testified that he "had no trouble" picking out the Defendant because it was "fresh in his mind." But he qualified his testimony: "Yeah, I'm pretty positive. I don't remember, it was over a year ago."

> Q: You don't remember. So you may have had trouble; is that –
> A: No, I don't think I had trouble. I'm not sure.
> Q: And you don't think you hesitated between a couple?
> A: If I would have hesitated, it would have been for a second maybe and I don't believe I did, no.

The video recording confirms that Dennis hesitated only for a second. Dennis's testimony at the May 13, 2013 hearing and the video recording do not materially change the Court's conclusion that despite the suggestive array, Dennis should be allowed to make an in-court identification if he can.

This is not to say the jury should not be given tools to assist them in assessing Dennis's in-court identification of the Defendant. Although the Government has indicated it will not ask Dennis about his pre-trial identification, the Defendant remains free to use that identification to demonstrate the weaknesses inherent in Dennis's in-court identification. Defense counsel will be given ample opportunity to cross-examine Dennis on his interaction with the man on the back porch and the suggestive circumstances of his pre-trial identification. The Defendant may also be entitled to a jury instruction on the risks of cross-racial identification, the risks of identifications made under stressful circumstances, the weak correlation between a witness's confidence and the accuracy of the identification, and the influence of suggestive identification practices. *See Jones,* 689 F.3d at 19-20.

## Conclusion

For the foregoing reasons, the Court concludes that the Government is not precluded from asking Dennis if he can make an in-court identification of the Defendant. The Defendant's First Motion in Limine and Motion to Suppress Identification Evidence as re-opened are **DENIED.**

SO ORDERED.

Dated this 15th day of May, 2013.

                                                /s/ Nancy Torresen
                                                United States District Judge